SEALED

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Norfolk Division



APR 1 8 2012

| | |
|---|---|
| UNITED STATES OF AMERICA | **UNDER SEAL** |
| | **CRIMINAL NO. 2:12cr 59** |
| v. | 18 U.S.C. § 371 (Conspiracy to Commit Criminal Copyright Infringement - Count 1) |
| | 17 U.S.C. § 506(a)(1)(A) & 18 U.S.C. § 2319(b)(1) & 2 (Criminal Copyright Infringement – Counts 2-5) |
| JERAMIAH E. PERKINS, a/k/a "Butch Perkins," "Stash," and "theestas," (Counts 1-6), | |
| GREGORY A. CHERWONIK, a/k/a "Fatal," "Cherwonk," "Spunky," "C0der," and "Superduper," (Counts 1-6), | 17 U.S.C. § 506(a)(1)(C) & 18 U.S.C. § 2319(d)(2) & 2 (Criminal Copyright Infringement – Distribution of Work Being Prepared for Commercial Distribution – Count 6) |
| WILLIE O. LAMBERT, a/k/a "HoaD" and "hellofaday," (Counts 1-5), and | 17 U.S.C. § 506(b) 18 U.S.C. §§ 981 & 2323 (Forfeiture) |
| SEAN M. LOVELADY, a/k/a "dankaholic," "aholic69," and "ez3kial," (Counts 1 and 4-5). | |

## INDICTMENT

APRIL 2012 TERM – at Norfolk, Virginia

THE GRAND JURY CHARGES THAT:

### COUNT ONE
(Conspiracy to Commit Criminal Copyright Infringement)

A.   THE CONSPIRACY

From in or about September 2009 through in or about September 2011, the exact dates being unknown, in the Eastern District of Virginia and elsewhere, defendants JERAMIAH E. PERKINS, GREGORY A. CHERWONIK, WILLIE O. LAMBERT, and SEAN M. LOVELADY, knowingly and unlawfully combined, conspired, confederated, and agreed

together with one another and others known and unknown to the grand jury, to commit the following offenses against the United States, that is,

(1) to willfully, and for the purpose of private financial gain, infringe copyrights by reproducing and distributing, during a 180-day period, ten or more copies of one or more copyrighted works having a total retail value of more than $2,500 in violation of Title 17, United States Code, Section 506(a)(1)(A), and Title 18, United States Code, Sections 2319(b)(1) and 2; and

(2) to willfully, and for the purpose of private financial gain, infringe copyrights by distributing at least one copy of a copyrighted work being prepared for commercial distribution by making such works available on a computer network accessible to members of the public, when the defendants knew and should have known that such works were intended for commercial distribution, in violation of Title 17, United States Code, Section 506(a)(1)(C), and Title 18, United States Code, Sections 2319(d)(2) and 2.

B.   WAYS, MANNER, AND MEANS

The ways, manner, and means by which the conspiracy was carried out included, but were not limited to, the following:

1.   The object of the conspirators' illegal agreement was to unlawfully obtain, reproduce, and distribute via the Internet copies and phonorecords of copyrighted works, including movies , music, TV shows, games, and instructional videos, without permission from the owners of these copyrighted works. The conspirators informally identified themselves as the IMAGiNE Group and sought, among other things, to be the premier group to first release to the Internet copies of new motion pictures only showing in movie theaters.

2.   It was a part of the conspiracy to obtain, by various means, copies of the video and audio components of motion pictures currently showing in theaters that had not yet been commercially released on DVD/Blu-ray or in any other form for sale to the general public. For

2

example, conspirators obtained digital video copies of motion pictures by using an audiovisual recording device, such as a camcorder, to make copies of, or "cam," newly released motion pictures showing in movie theaters.   Similarly, other conspirators used other audiovisual equipment, including FM and infrared receivers, to capture and to record the audio portion of newly released motion pictures at movie theaters and drive-in theaters for use by the conspirators. After capturing the video and audio portions of a motion picture, one or more conspirators would upload such files to a computer.

3.    It was further a part of the conspiracy to use computer software to digitally refine and to edit the video and audio portions of a motion picture and to combine or synchronize the two components into audiovisual movie files. After doing so, one or more members of the IMAGiNE Group then reproduced and distributed the copies of the files without permission of the copyright owners.

4.    It was further a part of the conspiracy to rent computer servers, including servers located in France, Canada, and the United States, to host one or more websites, such as "unleashthe.net." Such websites included, among other things, member profiles, a torrent tracker (a computer server assisting in communications among members using the BitTorrent file sharing technology), discussion forums, a message board or "shoutbox," and news, rules, and other information about making donations to and using the IMAGiNE Group's website.   The IMAGiNE Group also rented computer servers to provide workspace in which the conspirators could upload, download, format, store, and ready infringing (also called "pirated") copies of copyrighted works for distribution by the IMAGiNE Group among themselves, for sale to others, for distribution to thousands of IMAGiNE Group members, and for eventual release to the Internet.

5.    It was further a part of the conspiracy to pay for and to register Internet domain names for use by the IMAGiNE Group, including unleashthe.net, pure-imagination.us, and pure-imagination.info.

3

6.     It was further a part of the conspiracy to establish an account with PayPal in the name of "unleashthe.net" to accept donations made by conspirators and by other website users to fund expenses, including the cost of renting servers used by the conspirators, and to accept payments for the unauthorized distribution and sale of pirated copies of copyrighted works by the IMAGiNE Group.

7.     During and as part of the conspiracy, the conspirators played different roles in the operation of the IMAGiNE Group and participated in the conspiracy through various criminal acts. These roles included acting as website owner/operator, website administrators, webpage designer/coder, website moderators, movie "cammers," audio recorders or "cappers" who captured motion picture audio, "encoders" (who sharpened, straightened, and edited video), and "syncers" (who synchronized the video and audio files).

8.     During and as a part of the conspiracy, the conspirators illegally reproduced and distributed over the Internet thousands of copies of copyrighted works, including motion pictures still playing in movie theaters and movies released on DVD/Blu-ray.   As a result of the conspiracy, the owners of the copyrighted works suffered losses.

C.     OVERT ACTS

In furtherance of the offenses which were the objects of the conspiracy, the following overt acts, among others, were committed in the Eastern District of Virginia and elsewhere:

1.     On or about December 8, 2009, GREGORY A. CHERWONIK ordered an 8-channel wide-band receiver with belt clip costing approximately $78.25 for use in capturing and recording the sound tracks of motion pictures showing in theaters.

2.     On or about December 13, 2009, IMAGiNE member "nnc" "seeded," that is, made available for download over the Internet by others using BitTorrent file-sharing technology, a copy of some or all of the files that together constituted the copyrighted motion picture "The Men Who Stare At Goats" without authorization from the copyright holder.  The

4

torrent, which is an informational file used to facilitate further reproduction and distribution of a target file (such as a copy of a copyrighted work), was named "The.Men Who Stare at Goats TS XviD-IMAGiNE," signifying that the IMAGiNE Group released the unauthorized copy of the movie.

3.   On or about December 19, 2009, GREGORY A. CHERWONIK "seeded" a copy of the copyrighted motion picture "Avatar" (which would not be commercially available on DVD until on or about April 22, 2010) without authorization from the copyright holder. The torrent was named "Avatar.TS.XviD-IMAGiNE," signifying that the IMAGiNE Group released the unauthorized copy of the movie.

4.   On or about March 31, 2010 in the Eastern District of Virginia, JERAMIAH E. PERKINS took delivery of a compact infrared receiver that he bought for approximately $102.00 for use in capturing and recording the sound tracks of motion pictures showing in theaters.

5.   On or about April 6, 2010 in the Eastern District of Virginia, JERAMIAH E. PERKINS exchanged text messages with IMAGiNE member "nnc" encouraging him to secretly film the motion picture "Clash of the Titans," which was released to movie theaters on April 2, 2010.

6.   On or about April 8, 2010, in Chesapeake in the Eastern District of Virginia, IMAGiNE member "nnc" secretly used a video camera to film the motion picture "Clash of the Titans" at a Regal Cinema movie theater.

7.   On or about April 9, 2010, in the Eastern District of Virginia, JERAMIAH E. PERKINS sent a text message to "nnc" containing the Internet protocol ("IP") address of a server located in France to which "nnc" could upload the file for the "cammed" copy of "Clash of the Titans," so that PERKINS and others could ready it for further reproduction and distribution over the Internet.

8.   On or about April 12, 2010, conspirators in the IMAGiNE Group infringed the copyright of the motion picture "Clash of the Titans" (which would not be commercially

5

available on DVD in the U.S. until on or about July 27, 2010) by distributing copies of the movie over the Internet without authorization from the copyright holder.

9.  On or about May 4, 2010, GREGORY A. CHERWONIK used an Internet "shoutbox" or message board to talk with an IMAGiNE member about, among other things, adding audio to an infringing copy of the motion picture "A Nightmare on Elm Street" and stated that he "might need to go out friday by myself and get that sweeeet audio for Ironman."

10.  On or about May 5, 2010 in Palm Harbor, Florida, a conspirator secretly used a video camera to film the motion picture "Iron Man 2" at the Palm Harbor 10 movie theater.

11.  On or about May 10, 2010, after investigators searched GREGORY A. CHERWONIK's home pursuant to a court-authorized warrant, JERAMIAH E. PERKINS posted a message on a website message board telling other conspirators, among other things, that "I made a complete backup of the entire site just incase no one could okay . . . database and all."

12.  On or about May 12, 2010, one or more conspirators distributed a copy of the copyrighted motion picture "Iron Man 2" (which would not be commercially available on DVD until on or about September 28, 2010) over the Internet without authorization from the copyright holder. The torrent was named "Iron Man 2 TS READNFO V2 XViD – IMAGiNE," signifying that the IMAGiNE Group released the unauthorized copy of the movie.

13.  On or about July 9, 2010, an IMAGiNE member posted a message on a website message board telling other conspirators that he was "encoding the ateam [a reference to the motion picture "The A Team" which was released to movie theaters on June 11, 2010] audio now . . . ."

14.  On or about July 16, 2010, JERAMIAH E. PERKINS posted a message on the IMAGiNE Group's message board stating "im just back from getting audio for the sorcerers apprentice [a reference to the motion picture "The Sorcerer's Apprentice" which was released to movie theaters on July 14, 2010] . . . turned out nice . . . ."

6

15.    On or about July 16, 2010, WILLIE O. LAMBERT posted a message on the IMAGiNE Group's message board stating "nice . . Stash .. And guess what I think I got Despicable [a reference to the motion picture "Despicable Me" which was released to movie theaters on July 9, 2010] synced . . Did it by matching the audio . . well any way still checking it . . . ."

16.    On or about July 16, 2010, a conspirator posted a message on the IMAGiNE Group's message board stating "ok guys sending despicable me to server now."

17.    On or about July 17, 2010, an IMAGiNE member posted a message on the IMAGiNE Group's message board stating "Well couldn't see encoded file of The Sorcerer's Apprentice so i've start[ed] that off."

18.    On or about July 17, 2010, JERAMIAH E. PERKINS posted a message on the IMAGiNE Group's message board stating "well.. cant grab audio from the parking lot there . . . since i couldn't grab it from there i went inside and talked to the owner again . . . he told me that i do not even need an fm receiver there . . . i can plug straight into there system. * * * will prolly be going to the 7pm show tonight . . . ."

19.    On or about July 19, 2010, WILLIE O. LAMBERT posted a message on the IMAGiNE Group's message board stating "I have to test my new recorder and make sure it work and how to work it."   After JERAMIAH PERKINS responded to this post, WILLIE O. LAMBERT stated "Plus have to find a new place to go going to the same place all the time is looking for trouble."

20.    On or about July 19, 2010, JERAMIAH E. PERKINS responded to LAMBERT's message stating "i called every local cinema to see what they broadcasted in . . . ." He further stated "i told them a bs sob story bro . . . told the manager i had a hearing impaired daughter and she had a phobia about other peoples heads being on there in house equipment so i told them i was going to buy her one, so they would find out and tell me then . . . ."

7

21.     On or about July 24, 2010, JERAMIAH E. PERKINS posted a message on the IMAGiNE Group's website providing links and instructions for purchasing an "IR" or infrared receiver for capturing motion picture audio in movie theaters and stated, among other things, "Wear the ir receiver high around your neck and just put the plugged in recorder in your pocket or somewhere hidden."

22.     On or about July 26, 2010, in the Eastern District of Virginia and elsewhere, JERAMIAH E. PERKINS and GREGORY A. CHERWONIK created a new website for the IMAGiNE Group hosted on a computer server located in France.

23.     On or about August 1, 2010, JERAMIAH E. PERKINS, WILLIE O. LAMBERT, and another IMAGiNE member discussed establishing and naming their own "torrent tracker," a computer server that coordinates the sharing of files among members and users of a BitTorrent file-sharing network.

24.     On or about August 1, 2010, in the Eastern District of Virginia and elsewhere, JERAMIAH E. PERKINS registered the domain names pure-imagination.info and pure-imagination.us for use by the IMAGiNE Group.

25.     On or about August 17, 2010, GREGORY A. CHERWONIK and JERAMIAH E. PERKINS posted messages on The IMAGiNE Group's website and agreed to use only one PayPal account for donations made to support the group's website.

26.     On or about August 18, 2010, in the Eastern District of Virginia and elsewhere, JERAMIAH E. PERKINS created and subscribed to an email account with Google under the name of "pure imagination" and with an address of pure.imagination.site@gmail.com .

27.     On or about August 18, 2010, in the Eastern District of Virginia and elsewhere, JERAMIAH E. PERKINS opened an account with PayPal (under the name "UnleashThe.Net" and with the email identifier of pure.imagination.site@gmail.com) to receive member contributions towards IMAGiNE Group expenses, to receive donations and payments from persons downloading copies of and supporting the IMAGiNE Group's release of pirated motion

8

pictures, music, and other copyrighted files, and to fund payments to the Internet Service Providers ("ISP") hosting the French and other computer servers used by the IMAGiNE Group.

28. On or about August 22, 2010, WILLIE O. LAMBERT transferred approximately $50.00 to the UnleashThe.Net PayPal account with the note "Pure-Imagination."

29. On or about September 10, 2010, GREGORY A. CHERWONIK transferred approximately $5.00 to the UnleashThe.Net PayPal account with the note "Server Funds (Superduper)."

30. On or about September 11, 2010, GREGORY A. CHERWONIK transferred approximately $5.00 to the UnleashThe.Net PayPal account with the note "Server Funds (spunky)."

31. On or about September 26, 2010, in the Eastern District of Virginia and elsewhere, JERAMIAH E. PERKINS distributed a copy of the copyrighted motion picture "The Town" (which would not be commercially available on DVD in the U.S. until on or about December 17, 2010), over the Internet without authorization from the copyright holder, to a server in exchange for a payment of approximately $300.00 to the PayPal account used to fund the IMAGiNE Group's rental of computer servers.

32. On or about September 30, 2010, a conspirator used a message board on the unleashthe.net website to send a message to JERAMIAH E. PERKINS about "getting servers . . . for sources."

33. On or about October 16, 2010, in the Eastern District of Virginia and elsewhere, JERAMIAH E. PERKINS distributed a copy of the copyrighted motion picture "The Social Network" (which would not be commercially available on DVD in the U.S. until on or about January 1, 2011), over the Internet without authorization from the copyright holder, to a server in exchange for a payment of approximately $400.00 to the PayPal account used to fund the IMAGiNE Group's rental of computer servers.

9

34.     On or about October 26, 2010, WILLIE O. LAMBERT transferred approximately $50.00 to the UnleashThe.Net PayPal account with the note "Server Funds."

35.     On or about December 20, 2010, GREGORY A. CHERWONIK reproduced a copy of the copyrighted motion picture "The Tourist" without authorization from the copyright holder by downloading a copy of the movie over the Internet.

36.     From on or about December 20, 2010 until on or about January 15, 2011, GREGORY A. CHERWONIK "seeded" a copy of the copyrighted motion picture "The Tourist" without authorization for the copyright holder.

37.     From on or about December 20, 2010 until on or about January 15, 2011, GREGORY A. CHERWONIK distributed a copy of some or all of the files that together constituted the copyrighted motion picture "The Tourist" (which would not be commercially available on DVD in the U.S. until on or about March 22, 2011) over the Internet and without authorization from the copyright holder.

38.     On or about December 27, 2010, GREGORY A. CHERWONIK reproduced a copy of the copyrighted motion picture "Little Fockers" without authorization from the copyright holder by downloading a copy of the movie over the Internet.

39.     From on or about December 27, 2010 until on or about December 30, 2010, GREGORY A. CHERWONIK "seeded" a copy of the copyrighted motion picture "Little Fockers" without authorization from the copyright holder.  The torrent was named "Little Fockers 2011 TS XViD-IMAGiNE," signifying that the IMAGiNE Group released the unauthorized copy of the movie.

40.     From on or about December 27, 2010 until on or about December 30, 2010, GREGORY A. CHERWONIK distributed a copy of some or all of the files that together constituted the copyrighted motion picture "Little Fockers" (which would not be commercially available on DVD in the U.S. until on or about April 5, 2011) over the Internet and without authorization from the copyright holder.

41. On or about December 31, 2010, WILLIE O. LAMBERT reproduced a copy of the copyrighted software "Windows 7" operating system without authorization from the copyright holder by downloading a copy of the software over the Internet.

42. From on or about December 31, 2010 until on or about February 25, 2011, WILLIE O. LAMBERT "seeded" a copy of the copyrighted software "Windows 7" operating system without authorization from the copyright holder.

43. From on or about December 31, 2010 until on or about February 25, 2011, WILLIE O. LAMBERT distributed a copy of some or all of the files that together constituted the copyrighted software "Windows 7" operating system over the Internet and without authorization from the copyright holder.

44. On or about January 11, 2011, a conspirator used a forum on the unleashthe.net website to give advice about "camming" movies and said to cover the video camera with "black tape" and to put it "inside a black sock with a hole at the end to let the lens out . . . ."

45. On or about January 15, 2011, GREGORY A. CHERWONIK reproduced a copy of the copyrighted motion picture "The Chronicles of Narnia: The Voyage of the Dawn Treader" without authorization from the copyright holder by downloading a copy of the movie over the Internet.

46. From on or about January 15, 2011 until on or about January 20, 2011, GREGORY A. CHERWONIK "seeded" a copy of the copyrighted motion picture "The Chronicles of Narnia: The Voyage of the Dawn Treader" without authorization from the copyright holder. The torrent was named "The Chronicles of Narnia – The Voyage of the Dawn Treader v2 TS XViD-IMAGiNE," signifying that the IMAGiNE Group released the unauthorized copy of the movie.

47. From on or about January 15, 2011 until on or about January 20, 2011, GREGORY A. CHERWONIK distributed a copy of some or all of the files that together constituted the copyrighted motion picture "The Chronicles of Narnia: The Voyage of the Dawn

11

Treader" (which would not be commercially available on DVD in the U.S. until on or about April 8, 2011) over the Internet and without authorization from the copyright holder.

48. On or about January 17, 2011, GREGORY A. CHERWONIK reproduced a copy of the copyrighted motion picture "The Green Hornet" without authorization from the copyright holder by downloading a copy of the movie over the Internet.

49. From on or about January 17, 2011 until on or about January 20, 2011, GREGORY A. CHERWONIK "seeded" a copy of the copyrighted motion picture "The Green Hornet" without authorization from the copyright holder. The torrent was named "The Green Hornet 2011 TS READNFO XViD-IMAGiNE," signifying that the IMAGiNE Group released the unauthorized copy of the movie.

50. From on or about January 17, 2011 until on or about January 20, 2011, GREGORY A. CHERWONIK distributed a copy of some or all of the files that together constituted the copyrighted motion picture "The Green Hornet" (which would not be commercially available on DVD in the U.S. until on or about May 3, 2011) over the Internet and without authorization from the copyright holder.

51. On or about January 17, 2011, WILLIE O. LAMBERT reproduced a copy of the copyrighted motion picture "The Green Hornet" without authorization from the copyright holder.

52. From on or about January 17, 2011 until on or about February 25, 2011, WILLIE O. LAMBERT "seeded" a copy of the copyrighted motion picture "The Green Hornet" without authorization from the copyright holder. The torrent was named "The Green Hornet 2011 TS READNFO XViD-IMAGiNE," signifying that the IMAGiNE Group released the unauthorized copy of the movie.

53. From on or about January 17, 2011 until on or about February 25, 2011, WILLIE O. LAMBERT distributed a copy of some or all of the files that together constituted the copyrighted motion picture "The Green Hornet" over the Internet and without authorization from the copyright holder.

12

54. On or about January 19, 2011, in the Eastern District of Virginia and elsewhere, JERAMIAH E. PERKINS used the UnleashThe.Net PayPal account to fund the payment of approximately $67.62 to the French ISP providing services to the IMAGiNE Group.

55. On or about February 13, 2011, GREGORY A. CHERWONIK reproduced a copy of the copyrighted motion picture "Yogi Bear" without authorization from the copyright holder by downloading a copy of the movie over the Internet.

56. From on or about February 13, 2011 until on or about February 16, 2011, GREGORY A. CHERWONIK "seeded" a copy of the copyrighted movie "Yogi Bear" without authorization from the copyright holder. The torrent was named "Yogi Bear 2010 TS V2 XViD IMAGiNE," signifying that the IMAGiNE Group released the unauthorized copy of the movie.

57. From on or about February 13, 2011 until on or about February 16, 2011, GREGORY A. CHERWONIK distributed a copy of some or all of the files that together constituted the copyrighted motion picture "Yogi Bear" (which would not be commercially available on DVD in the U.S. until on or about March 22, 2011) over the Internet and without authorization from the copyright holder.

58. On or about February 22, 2011, in the Eastern District of Virginia and elsewhere, JERAMIAH E. PERKINS used the UnleashThe.Net PayPal account to fund the payment of approximately $110.25 to the French ISP providing services to the IMAGiNE Group.

59. On or about February 22, 2011, GREGORY A. CHERWONIK reproduced a copy of the copyrighted motion picture "Big Mommas: Like Father Like Son" without authorization from the copyright holder by downloading a copy of the movie over the Internet.

60. From on or about February 22, 2011 until on or about February 23, 2011, GREGORY A. CHERWONIK "seeded" a copy of the copyrighted motion picture "Big Mommas: Like Father Like Son" without authorization from the copyright holder. The torrent was named "Big Mommas Like Father Like Son 2011 New Source TS V2 XViD – IMAGiNE," signifying that the IMAGiNE Group released the unauthorized copy of the movie.

61. From on or about February 22, 2011 until on or about February 23, 2011, GREGORY A. CHERWONIK distributed a copy of some or all of the files that together constituted the copyrighted motion picture "Big Mommas: Like Father Like Son" (which would not be commercially available on DVD in the U.S. until on or about June 14, 2011) over the Internet and without authorization from the copyright holder.

62. On or about March 24, 2011, in the Eastern District of Virginia and elsewhere, JERAMIAH E. PERKINS used the UnleashThe.Net PayPal account to fund the payment of approximately $114.19 to the French ISP providing services to the IMAGiNE Group.

63. On or about April 22, 2011, in the Eastern District of Virginia and elsewhere, JERAMIAH E. PERKINS used the UnleashThe.Net PayPal account to fund the payment of approximately $117.66 to the French ISP providing services to the IMAGiNE Group.

64. On or about May 19, 2011, in the Eastern District of Virginia and elsewhere, JERAMIAH E. PERKINS used the UnleashThe.Net PayPal account to fund the payment of approximately $71.75 to the French ISP providing services to the IMAGiNE Group.

65. On or after June 24, 2011, SEAN M. LOVELADY secretly used an audio recording device to obtain the sound track from the motion picture "Bad Teacher" (which would not be commercially available on DVD in the U.S. until on or about October 18, 2011) from a movie theater in Montclair, CA.

66. On or about July 8, 2011, in the Eastern District of Virginia and elsewhere, after chatting on Skype about SEAN M. LOVELADY's efforts to format pirated copies of the motion pictures "X-Men" and "Bad Teacher," JERAMIAH E. PERKINS thanked LOVELADY and offered to buy and send him an MP3 player with an FM receiver for capturing and recording the audio of motion pictures showing in theaters.

67. On or about July 21, 2011, in the Eastern District of Virginia and elsewhere, after SEAN M. LOVELADY provided him with his home address in Pomona, CA, JERAMIAH E.

14

PERKINS sent to LOVELADY an MP3 player with an FM receiver for capturing and recording the audio for motion pictures, which LOVELADY received on or about July 22, 2011.

68.     On or about July 23, 2011, SEAN M. LOVELADY secretly used an audio recording device to obtain the sound track from the motion picture "Friends with Benefits" from a movie theater in Montclair, CA.

69.     On or about July 23, 2011, in Florida, a conspirator secretly used a video camera to film the copyrighted motion picture "Captain America: The First Avenger" and then uploaded it to a server used by the IMAGiNE Group.

70.     On or about July 23, 2011, in Florida and elsewhere, SEAN M. LOVELADY, who secretly recorded the audio for "Captain America: The First Avenger," discussed with another conspirator uploading and editing the audio and video portions of the motion picture for later distribution of the combined movie file by the IMAGiNE Group.

71.     On or about July 26, 2011, a conspirator infringed the copyright of the motion picture "Captain America: The First Avenger" (which would not be commercially available on DVD in the U.S. until on or about October 25, 2011) by making a copy of it available on computer servers and distributing it over the Internet without authorization from the copyright holder.

72.     On or about July 29, 2011, SEAN M. LOVELADY reproduced a copy of the copyrighted motion picture "Friends with Benefits" without authorization from the copyright holder by downloading a copy of the movie over the Internet.

73.     From on or about July 29, 2011 until on or about July 30, 2011, SEAN M. LOVELADY "seeded" a copy of the copyrighted motion picture "Friends with Benefits" without authorization from the copyright holder. The torrent was named "Friends with Benefits 2011 TS XViD – IMAGiNE," signifying that the IMAGiNE Group released the unauthorized copy of the movie.

74. From on or about July 29, 2011 until on or about July 30, 2011, SEAN M. LOVELADY distributed a copy of some or all of the files that together constituted the copyrighted motion picture "Friends with Benefits" (which would not be commercially available on DVD in the U.S. until on or about December 2, 2011) over the Internet and without authorization from the copyright holder.

75. On or about August 20, 2011, in Florida, a conspirator secretly used a video camera to film the copyrighted motion picture "Fright Night" at a movie theater, transferred it to one of his computers, and uploaded the file to a server used by the IMAGiNE Group.

76. On or about August 21, 2011, in the Eastern District of Virginia and elsewhere, JERAMIAH E. PERKINS downloaded the "Fright Night" file and began the processing the file so that it could be released by the IMAGiNE Group.

77. On or about August 26, 2011, a conspirator further processed the "Fright Night" file so that it could be released by the IMAGiNE Group.

78. On or about September 4, 2011, WILLIE O. LAMBERT reproduced a copy of the copyrighted motion picture "Fright Night" (which would not be commercially available on DVD until on or about December 13, 2011) without authorization from the copyright holder.

(In violation of Title 18, United States Code, Section 371).

## COUNT TWO
(Criminal Copyright Infringement)

1.    The allegations contained in paragraphs 1-78 of count one are hereby re-alleged and incorporated by reference, as if fully set forth herein.

2.    Beginning on or about September 15, 2009, until on or about March 14, 2010, in the Eastern District of Virginia and elsewhere, defendants JERAMIAH E. PERKINS, GREGORY A. CHERWONIK, and WILLIE O. LAMBERT willfully and for the purpose of private financial gain, did infringe copyrights by reproducing and distributing during a one hundred and eighty (180) day period ten (10) or more copies and phonorecords of one (1) or more copyrighted works with a total retail value of more than $2,500.

(In violation of Title 17, United States Code, Section 506(a)(1)(A), and Title 18, United States Code, Sections 2319(b)(1) and 2).

## COUNT THREE
(Criminal Copyright Infringement)

1.      The allegations contained in paragraphs 1-78 of count one are hereby re-alleged and incorporated by reference, as if fully set forth herein.

2.      Beginning on or about March 15, 2010, until on or about September 11, 2010, in the Eastern District of Virginia and elsewhere, defendants JERAMIAH E. PERKINS, GREGORY A. CHERWONIK, and WILLIE O. LAMBERT willfully and for the purpose of private financial gain, did infringe copyrights by reproducing and distributing during a one hundred and eighty (180) day period ten (10) or more copies and phonorecords of one (1) or more copyrighted works with a total retail value of more than $2,500.

(In violation of Title 17, United States Code, Section 506(a)(1)(A), and Title 18, United States Code, Sections 2319(b)(1) and 2).

18

## COUNT FOUR
(Criminal Copyright Infringement)

1.   The allegations contained in paragraphs 1-78 of count one are hereby re-alleged and incorporated by reference, as if fully set forth herein.

2.   Beginning on or about September 12, 2010, until on or about March 11, 2011, in the Eastern District of Virginia and elsewhere, defendants JERAMIAH E. PERKINS, GREGORY A. CHERWONIK, WILLIE O. LAMBERT, and SEAN M. LOVELADY willfully and for the purpose of private financial gain, did infringe copyrights by reproducing and distributing during a one hundred and eighty (180) day period ten (10) or more copies and phonorecords of one (1) or more copyrighted works with a total retail value of more than $2,500.

(In violation of Title 17, United States Code, Section 506(a)(1)(A), and Title 18, United States Code, Sections 2319(b)(1) and 2).

## COUNT FIVE
(Criminal Copyright Infringement)

1.    The allegations contained in paragraphs 1-78 of count one are hereby re-alleged and incorporated by reference, as if fully set forth herein.

2.    Beginning on or about March 12, 2011, until on or about September 8, 2011, in the Eastern District of Virginia and elsewhere, defendants JERAMIAH E. PERKINS, GREGORY A. CHERWONIK, WILLIE O. LAMBERT, and SEAN M. LOVELADY willfully and for the purpose of private financial gain, did infringe copyrights by reproducing and distributing during a one hundred and eighty (180) day period ten (10) or more copies and phonorecords of one (1) or more copyrighted works with a total retail value of more than $2,500.

(In violation of Title 17, United States Code, Section 506(a)(1)(A), and Title 18, United States Code, Sections 2319(b)(1) and 2).

20

## COUNT SIX
(Criminal Copyright Infringement – Distribution of a
Work Being Prepared for Commercial Distribution)

On or about February 13, 2011 through on or about February 19, 2011, in the Eastern District of Virginia and elsewhere, defendant JERAMIAH E. PERKINS, aided and abetted by defendant GREGORY A. CHERWONIK, willfully and for the purpose of private financial gain, did infringe copyrights by distributing a copyrighted work being prepared for commercial distribution, to wit, the motion picture "Yogi Bear," by making such work available on a computer network accessible to members of the public, when the defendants knew and should have known that such work was intended for commercial distribution.

(In violation of Title 17, United States Code, Section 506(a)(1)(C), and Title 18, United States Code, Sections 2319(d)(2) and 2).

## FORFEITURE

1.     Defendants JERAMIAH E. PERKINS, GREGORY A. CHERWONIK, WILLIE O. LAMBERT, and SEAN M. LOVELADY, if convicted of any of the violations alleged in counts one through six of this indictment, shall forfeit to the United States as part of the sentencing and pursuant to Fed. R. Crim. P. 32.2:

a.     Respecting count one, any real or personal property constituting and derived from proceeds obtained directly or indirectly as a result of, or traceable to, the violation of Title 18, United States Code, Section 371, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c);

b.     Respecting counts two through six:

i.     any article trafficked in and made in violation of Title 17, United States Code, Sections 506(a)(1)(A) & 506(a)(1)(C), and Title 18, United States Code, Sections 2319(b)(1) & 2319(d)(2), pursuant to Title 18, United States Code, Section 2323(a) & (b);

ii.     any property used, and intended to be used, in any manner or part to commit and to facilitate the violation of Title 17, United States Code, Sections 506(a)(1)(A) & 506(a)(1)(C), and Title 18, United States Code, Sections 2319(b)(1) & 2319(d)(2), pursuant to Title 18, United States Code, Section 2323(a) & (b); and

iii.     any property constituting, and derived from, any proceeds obtained directly or indirectly as a result of, or traceable to, the violation of Title 17, United States Code, Sections 506(a)(1)(A) & 506(a)(1)(C), and Title 18, United States Code, Sections 2319(b)(1) & 2319(d)(2), pursuant to Title 18, United States Code, Section 2323(a) & (b); and

c.     Any other property belonging to the defendants, up to the value of the property subject to forfeiture, if any property subject to forfeiture: (a) cannot be located upon the exercise of due diligence; (b) has been transferred to, sold to, or deposited with a third person; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be subdivided without difficulty.

22

2.    The property subject to forfeiture under paragraph 1 includes, but is not limited to the following property:

| |
|---|
| A sum of money representing the proceeds obtained as a result of, or traceable to, the violations of Title 18, United States Code, Sections 371, 2319(b)(1), and 2319(d)(2), and Title 17, United States Code, Sections 506(a)(1)(A) and 506(a)(1)(C), which shall be reduced to a monetary judgment upon entry of an order of forfeiture. |
| Lite Cool Master Black Computer |
| AZZA Black Computer Tower |
| RCA MP3 Player w/USB |
| Black Thumb Drive |
| External Hard Drive - Gold Color |
| Approximately 7 Assorted Computer Discs |
| Approximately 2 Sony Video Cassettes |
| Approximately 58 Assorted Discs |
| Approximately 8 Assorted DVD Discs |
| |
| Cool Master Computer Tower, Serial #CACT05UW0074101458 |
| ASUS Thermal Take Computer Tower, Serial #VL80001W2Z1102006101 |
| AZZA Black and Red Computer Tower |
| Toshiba Laptop Computer, Serial #3A643174K |
| Attache PNY 2G Thumb Drive Blue |
| Attache PNY Thumb Drive Red |
| Hard Drive, Serial #WCAL96128625 |
| Approximately 224 Compact Discs |
| HI 8 Video Cassette |
| Floppy Disc |
| Blackberry Cell Phone, PIN#30B52942 |
| |

| |
|---|
| Hitachi Hard Drive, Serial #TCGR5MAP |
| Gateway Laptop, Serial #GWTF742019S |
| Western Digital Hard Drive, Serial #WCAL76443207 |
| Gateway Laptop, Serial #GWTF7380SZS |
| LG Cellular Telephone (White) |
| ACER Laptop, Serial #LXPXB020810400338F2000 |
| HP Laptop, Serial #CNF9434KG2 |
| HP Laptop, Serial #C908501SJG |
| HP Pavilion, Serial #MXG80702KP |
| E Machines Computer, Serial #CCA6150017331 |
| Apple Laptop |
| Verizon LG Cell Phone (Black) |
| Verizon Motorola Cell Phone |
| Card Reader/Burner |
| Fujitsu Hard Drive |
| |
| COMPAQ Presario CPU, Serial #CNH6150901 |
| Gateway Laptop, Serial #N636571032572 |
| Canon Digital Video Camera, Serial #42910700692 |
| External Hard Drive, Serial #WCAW44404300 |
| Approximately 273 CDs/DVDs |
| Thumb Drive |
| Approximately 4 Internal Hard Drives |

| |
|---|
| T-Mobile HTC Cell Phone |
| SinMax 10dBi Parabolic Antenna |
| Approximately Two Kingston Technology 2GB CPU RAM |
| SATA IDE to USB 2.0 Connector |
| USB Connector |
| Computer SD Card |
| Approximately Two SD Card Adapters |
| ADATA USB Infrared Adapter for Peripheral Device |
| |
| HP Pavilion, Serial #AMCVEEM7464TOS4O |
| SANSA MP3 Player, Model #SCH - U450 |
| Samsung Cell Phone |
| Nokia 5 MP Cell Phone |
| Approximately 663 Miscellaneous CDs/DVDs |

(All in accordance with Title 17, United States Code, Section 506(b); Title 18, United States Code, Section 2323(a) & (b); Title 18, United States Code, Section 981(a)(1)(C), as incorporated by Title 28, United States Code, Section 2461(c); and Title 21, United States Code, Section 853(p)).

REDACTED COPY

*United States v. Jeramiah E. Perkins, et al.*, 2:12cr59

A TRUE BILL:

REDACTED COPY

_____

FOREPERSON

Neil H. MacBride
United States Attorney
        REDACTED COPY

By:  _____

Robert J. Krask
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
8000 World Trade Center
101 West Main Street
Norfolk, VA 23510
Phone: (757) 441-6331
Fax: (757) 441-6689
bob.krask@usdoj.gov

Lanny A. Breuer
Assistant Attorney General
        REDACTED COPY

By:  _____

John H. Zacharia, Senior Counsel
Computer Crime and Intellectual Property Section
Attorney for the United States
United States Department of Justice
1301 New York Ave., NW
Suite 600
Washington, DC 20005
Phone: (202) 305-2310
Fax: (202) 514-6113
John.Zacharia@usdoj.gov

26